Filed 3/25/14  In re Emily G. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re EMILY G., a Person Coming Under the Juvenile Court Law. | B247870 |
| | (Los Angeles County Super Ct. No. CK84816) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| MARIA V., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Timothy R. Saito, Judge.  Affirmed.

Lori A. Fields, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kim Nemoy, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Maria V.'s daughter, Emily G., was declared a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivisions (b), (d) and (j).[1]  More than two years after the child was detained, the juvenile court held a contested section 366.22 permanency hearing and found returning Emily to mother would create a substantial risk of detriment to the child's emotional well-being.  The court terminated mother's reunification services and, with the parties' consent, selected long-term foster care as Emily's permanent placement plan.  To facilitate the possibility of future reunification, the court also ordered Emily to continue participating in conjoint therapy with mother.

Mother appeals the juvenile court's orders, arguing that: (1) there was insufficient evidence to support the court's finding Emily would be at risk of emotional detriment if returned to mother's care; (2) the court committed evidentiary error by refusing to permit mother's adult son to testify at the section 366.22 hearing; and (3) the court abused its discretion when it denied mother's request to continue the section 366.22 hearing to allow for further reunification services.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Initial Referral and Detention[2]

#### 1.  Referral and initial investigation

In October of 2010, Jesse G. (father) was living in Los Angeles, California with his two children, Joseph, then 16, and Emily, then 10.  The children's mother, Maria V., was living in North Carolina and had three adult children from a prior relationship: Jasmine L. (then 21), Richard L. (then 24) and David L. (then 23).  Between

---

[1]  Unless otherwise indicated, all further statutory citations are to the Welfare and Institutions Code.

[2]  Mother previously filed an appeal from the juvenile court's jurisdiction and dispositional orders in this matter.  In an unpublished decision, we affirmed the portion of the court's orders pertaining to Emily and reversed the portion of the orders pertaining to mother's now adult son Joseph.  (See *In re Joseph V.* (August 6, 2012) Case No. B232895.)  Our description of the facts and proceedings up to the April 2011 jurisdictional and disposition hearing is summarized from our prior unpublished opinion.

2

approximately 1996 and 2006, father and mother had lived together intermittently with Joseph, Emily, Jasmine, David and Richard.

On October 18, 2010, the Los Angeles County Department of Children and Family Services (DCFS) received a referral from the Los Angeles County Sheriff's Department (LASD) alleging sexual abuse to Joseph and Emily (collectively children). A detective reported the children's half-sister Jasmine had informed law enforcement that father (Jasmine's step-father) had sexually abused her for a number of years beginning when she was four years old. Jasmine stated Joseph and Emily were supposed to be living with mother in North Carolina, but were currently residing with father in Los Angeles. Mother had allegedly sent the children to visit father, and neither parent could afford to pay for their return trip to North Carolina. Although mother told Jasmine she did not believe father had "done anything sexual to the children," Jasmine was concerned for their safety based on her past experiences.

The detective who made the initial referral informed DCFS Jasmine had filed criminal reports in California and North Carolina accusing father of sexual abuse. The LASD had referred the matter to DCFS after Jasmine reported Joseph and Emily were currently under the care of their father. The detective provided DCFS with a police report summarizing the investigation of Jasmine's criminal complaint. Jasmine told law enforcement father began orally copulating her on a nightly basis when she was four years old. Father continued to orally copulate Jasmine until she was 10 or 12 years old, and then he started to "penetrate her vaginally with his penis." She also stated her two older brothers had each witnessed an act of abuse. The last incident of abuse occurred in 2006 while the family was staying at a hotel in Texas. The LASD also interviewed mother, who stated she knew father had "touched [Jasmine] sexually."

On October 20, 2010, DCFS contacted mother, who was residing in North Carolina. Mother stated she had allowed Joseph and Emily to visit their father in California. Although father was supposed to send the children back to North Carolina, father informed mother he did not have enough money to purchase their return tickets. Mother stated that Jasmine had disclosed father's sexual abuse in 2006 and that father

3

had admitted the allegations. Mother also told DCFS that, despite father's past abuse of Jasmine, she did not believe he presented a risk to Joseph or Emily because the children had always denied being abused by father and were primarily cared for by their paternal grandmother, who lived with father. Mother also stated that, in 2009, a social worker in North Carolina had investigated Jasmine's sexual abuse allegations "and told [mother] she could continue to send the kids to visit there [sic] father."

DCFS contacted Jasmine, then 21, who was residing in California. Jasmine stated she was sexually abused by father between the ages of 5 and 16 (approximately 1995-2006). Jasmine also stated that she and her older brother informed mother of the abuse when Jasmine was 10 years old (approximately 2000) and that father immediately moved out of the home. However, father later reconciled with mother and returned to the residence three years later. Father continued to sexually abuse Jasmine after moving back in to the home, but Jasmine never told mother.

On October 21, 2010, the social worker interviewed Joseph, who stated that he had been under the care of his father for approximately six months "after his mother sent him from North Carolina . . . for education purposes." Emily came to live with father and Joseph approximately four months later. Joseph stated he preferred to stay "in California under the care of his father due to mother's alcohol problems." Joseph reported that, when he left North Carolina, mother was drinking about 5 beers a day. Joseph said he had never been abused by father and he did not believe Jasmine's allegations.

DCFS also spoke to Emily, who stated that although she was supposed to return to her mother before school started in North Carolina, she "wanted to stay with her father longer." Emily reported that she "like[d] it here" and that she "did not want to return to her mother right now." Emily told DCFS mother drank on a daily basis and that "'she drinks one and then once she finishes it she gets another one.'" Emily denied ever seeing father touch Jasmine in an inappropriate manner and stated that nobody had ever touched her "inappropriately on her private areas."

DCFS interviewed grandmother, who lived in the father's home and cared for Joseph and Emily when father was away. Grandmother told DCFS she believed mother

4

was "having Jasmine falsify sexual abuse allegations" so she could get the children back and obtain financial support. Grandmother also alleged mother had an alcohol problem and that Joseph and Emily would be "better taken care of by herself and her son." Father called DCFS and stated that Jasmine's allegations were "unfounded" and said she "'like[d] to make things up.'"

### 2. *Section 300 petition and detention*

On October 26, 2010, DCFS filed a petition alleging Joseph and Emily came within the jurisdiction of the juvenile court pursuant to section 300, subdivisions (b), (d) and (j). The petition included an identical allegation under each subdivision alleging that father sexually abused Jasmine for a period of 12 years; that mother had knowledge of the abuse and failed to protect Jasmine; that mother had subsequently provided father access to Emily and Joseph; and that father's past abuse of Jasmine and mother's failure to protect the children placed them at risk of harm. The petition included a second allegation under subdivision (b) alleging mother was a "current abuser of alcohol which renders the mother incapable of providing regular care for the children. . . ." DCFS also filed a detention report in support of the petition summarizing its initial investigation. DCFS concluded the children were "at high risk if they continue in the care of father and mother" and recommended the court detain the children.

At the detention hearing, held October 26, 2010, mother and father each entered a general denial and requested the children be released to them. The children's counsel argued they should not be released to their mother because both children had "verif[ied] the [alcohol-related] allegation in (b)(2)." According to counsel, both children wanted to "go back to the father" and "adamantly" denied having been "touched" or "abused . . . in any way." Counsel requested that if the court was unwilling to release the children to the father, it should give DCFS discretion to release them to "the paternal grandmother with the father out of the home." The juvenile court ordered the children detained and permitted DCFS to place them with grandmother on the condition that father move out of the house.

## B. *Jurisdiction and Disposition*

### 1. *DCFS's jurisdiction/disposition report*

On November 29, 2010, DCFS filed a "Jurisdiction/Disposition Report" summarizing additional interviews it had conducted regarding the allegations of sexual abuse. DCFS reported that, during a second interview with Jasmine, she had been "consistent with her recollection of the sexual abuse" and "appeared honest[,] . . . sincere and emotional . . ."

DCFS also conducted additional interviews of Joseph, Emily, mother, father and grandmother. Joseph maintained that he wanted to remain in California, explaining he was "passionate about skate boarding" and believed his career would be "over" if he was forced to return to North Carolina. Emily stated that her mother "treat[ed] her well" and that she missed her "school and friends in North Carolina." When asked whether she wanted to return to North Carolina, Emily said "'that would be fine,'" adding: "'if my dad wants I can stay here to [*sic*] and visit my mom in the summer . . . . I'm ok here or with my mom.'"

Mother told DCFS her relationship with father had ended several times "over the sexual abuse allegations and problems with him not being able to hold a job down." Mother admitted she drank one or two beers on her days off, but denied that she ever got drunk or abused alcohol. Mother stated that she worked twelve-hour nursing shifts and was regularly subjected to alcohol and drug testing as part of her job.

Mother stated she had allowed Joseph and Emily to visit their father in California because he had never acted inappropriately with either of them. She also stated that North Carolina children's protection services had "investigated [Jasmine's] allegations and made an arrangement that father would agree to have [only] supervised contact with the children during visits." She further stated that the children's grandmother had agreed to monitor the father. DCFS also spoke to father and grandmother; they both reiterated that they believe mother had encouraged Jasmine to fabricate the sexual abuse allegations for financial reasons.

DCFS contacted North Carolina social worker Karla Joyner, who confirmed that North Carolina child protection services had sustained an "allegation of neglect toward father" and developed a "safety plan" that permitted mother to allow the children to visit father under the supervision of grandmother. Joyner also stated North Carolina had investigated alcohol abuse allegations against mother and found "no risk o[f] alcohol abuse."

Although DCFS concluded mother had made a "poor decision" when she permitted the children to visit father in California, it recommended the court release the children to her. In addendums to the jurisdictional report, DCFS confirmed it had "no concerns regarding the children's safety if they returned to the care of their mother" and believed "the counts against mother [were] not sustainable and that those counts should be dismissed from the petition."

### 2. *Adjudication hearing on jurisdiction and disposition*

In April and May of 2011, the juvenile court held a contested jurisdiction and dispositional hearing. DCFS stated that it was "recommending striking the mother entirely from the petition" and only intended to "proceed[] . . . on the allegations of sexual abuse regarding the father."

Jasmine testified at the hearing and represented that all of her prior statements to law enforcement and DCFS had been true. Jasmine provided detailed testimony describing the nature of the abuse, where it had occurred, when it had occurred, who had witnessed it and who she had told about it. After Jasmine testified, mother's counsel called father to testify. Father, however, announced he had elected to "plead the Fifth Amendment."

At closing argument, DCFS recommended the court sustain the allegations against the father, arguing that Jasmine's testimony was "credible" and showed "[Joseph and Emily] [we]re at risk of sexual abuse based upon [father's] abuse of their adult sibling when she was a child." DCFS argued that "mother [should] be stricken from the petition" because: (1) there was no evidence mother had any past or current drinking

7

problem; and (2) the evidence suggested mother had taken adequate precautions to protect Emily and Joseph from father by ensuring grandmother would monitor his contact with them.

Father's counsel, however, contended Jasmine and mother were "simply not credible" and that, even if Jasmine's allegations were true, there was no evidence father "pose[d] a substantial risk of harm or sexual abuse to his 16-year old son . . ." Counsel for the children argued Jasmine was credible, but disagreed with DCFS's recommendation to "have mother's failure to protect taken out of the petition." The children's counsel argued mother's decision to send Emily to California despite knowledge of father's past abuse of Jasmine placed Emily at substantial risk of harm. Counsel asserted, however, that Joseph was "differently situated" because of his age and sex.

The juvenile court dismissed allegation (b)(2), which related to mother's alleged alcohol abuse. The court sustained the remaining allegations with amended language regarding the allegations against mother stating that she "allowed the children Joseph and Emily to reside with the paternal grandmother in which she knew or reasonably should have known that father would have unlimited access to the children despite mother's knowledge of the father's sexual abuse of the sibling." The court ordered reunification services for both parents and order the children to remain placed with their paternal grandmother.

### 3. *Appeal of the jurisdictional and disposition orders*

Mother, father and Joseph each filed a timely appeal of the jurisdiction and dispositional orders. In an unpublished decision (see *Ante*, fn. 2), this court affirmed the portion of the juvenile court's orders pertaining to Emily, concluding there was substantial evidence that: (1) father sexually abused Jasmine; (2) mother failed to protect Jasmine from father and then exposed Emily to father; and (3) the parents' conduct placed Emily at substantial risk of harm. However, we reversed the portion of the order

8

pertaining to Joseph, concluding there was insufficient evidence to show father's sexual abuse of Jasmine placed his biological, 16-year-old son at risk of harm.

### C. *Section 366.21 Hearings*

#### *1. Section 366.21, subdivision (e) six-month review hearing*

In August of 2011, DCFS filed a progress report stating that Emily had adjusted well to her placement with grandmother and wanted to remain in Los Angeles because "none of us drink or smoke here." Emily told DCFS "[mother] used to drink a lot of beers a day" and that she was "afraid [mother] can drink again."

DCFS reported mother had begun attending individual therapy in North Carolina. Mother's therapist, James Lauve, informed DCFS she had been "extremely plausible and punctual in session . . . [and] ha[d] the best interests of the children in mind." DCFS concluded that although mother had initiated individual therapy, she had "yet to address case issues, heighten her awareness, and understand the impact of her failure to take action [to protect Jasmine or her children from father]." DCFS reported father had failed to maintain regular contact with the agency and appeared unwilling to comply with his reunification services. It recommended leaving all prior orders in place and setting the matter for a review hearing pursuant to section 366.21, subdivision (e). The court agreed with DCFS's recommendations and scheduled the hearing for November 1, 2011.

Prior to the hearing, DCFS filed a "Status Review Report" stating that mother was maintaining regular phone contact with Emily and meeting with therapist Lauve on a weekly basis. Although grandmother indicated father had regular contact with Emily, he had not contacted DCFS and had failed to respond to numerous letters regarding his case plan. DCFS reported Emily appeared to be bonded to her grandmother, exhibited "good sibling interaction" with her brother and demonstrated "overall good functioning in the home." DCFS further reported, however, that Emily had "conveyed some anxiety as to where she would be living and indicated she wants to remain in the care of the current caregiver." Although grandmother did not believe Emily needed to participate in therapy, DCFS believed she would "benefit from individual therapy to address pertinent

9

case issues and current uncertainty as to where [she] may reside." In its assessment, DCFS concluded father had failed to demonstrate any intent to participate in reunification services and that mother had yet to demonstrate full "insight as to the impact of her failure to protect her children."

The day before the hearing, DCFS submitted a letter from therapist Lauve confirming mother had attended weekly therapy sessions for the past several months. Lauve reported mother was "motivated, insightful and painfully suffering . . . [from her] separate[ion] from her two . . . children." According to Lauve, mother "appreciate[d] her inappropriate and harmful inaction around the issues between her elder daughter . . . Jasmine" and was frustrated that father still had access to Emily and Joseph. Lauve further reported mother was "anxious to assume her parental role with Emily" and was "excited about the prospect of engaging with t[her] children in therapy . . . in North Carolina . . . to move toward a normalization of their relationship."

At the hearing, the court ordered continued reunification services for both parents and scheduled a hearing pursuant to section 366.21, subdivision (f).

### 2. *Section 366.21, subdivision (f) 12-month permanency hearing*

DCFS filed a status report for the 12-month permanency hearing that contained the same factual information as the report it had filed for the prior hearing.[3] DCFS's recommendations, however, had changed. DCFS asserted that in light of father's refusal to participate in his case plan, the court should terminate his reunification services. DCFS recommended the court continue mother's reunification services and schedule an 18-month permanency review hearing pursuant to sections 366.21, subdivision (g) and 366.22. The court, however, elected to continue the 12-month permanency hearing and left all prior orders in place.

In a status report filed in March of 2012, DCFS reported mother was continuing to attend individual therapy and had committed to attend a sexual abuse program for non-

---

[3] Because of multiple continuances of the six-month review hearing, the 12-month permanency hearing was held approximately two weeks after that hearing.

offending parents. DCFS further reported Emily had "consistently maintained" she wanted to remain in Los Angeles with grandmother, but was "receptive to continued telephonic contact with . . . mother in North Carolina." According to DCFS, Emily appeared "thriving, alert [and] playful" and had agreed to attend individual counseling to address her anxiety about "where she would be living." Father was visiting the children two to three times per week under the supervision of grandmother; mother called the children every week from North Carolina.

DCFS recommended continued reunification services for mother and termination of father's services. The court, however, ordered continued reunification services for both parents and set a section 366.22 permanency review hearing for April 26, 2012.

### D. Section 366.22 Permanency Hearing

#### 1. DCFS status report recommending return of children

On April 26, 2012, DCFS filed a status report for the section 366.22 permanency hearing stating that Emily did "not oppose" reunifying with mother in North Carolina. The report indicated that although Emily was "emotionally connected with mother," she was concerned she would not be permitted to have any further visits with grandmother. DCFS's report was accompanied by a letter from therapist Lauve stating that mother had "complied with [her] treatment . . . with insight [and] enthusiasm" and demonstrated "high motivation, good insight and a commitment bordering on the heroic given the circumstance of the coast to coast relation to her children forced on her." Lauve further reported that mother held a "responsible position" at a local hospital and was engaged to a man who was "eager to be integrated into [mother's] reunited family unit." Lauve did not see any "signs of . . . inappropriate use of alcohol" and recommended the court return Emily to mother.

Based on Emily's statements and Lauve's progress report, DCFS recommended the court return Emily to mother and order family maintenance services, including individual and conjoint therapy. At a hearing held in April of 2012, the court ordered

11

DCFS to initiate an "ICPC" investigation on mother's home in North Carolina[4] and initiate conjoint counseling sessions between mother and Emily. The court scheduled a section 366.22 permanency hearing for June.

Shortly before the hearing was scheduled to occur, Emily submitted a handwritten letter to the court stating: "I would like to tell you that I would like to stay here with my grandma & dad, I like my school here, I get to go to the doctor and the dentist here and I have food and clothes that fit me. I still love my mom but I would like to stay here in California with my grandma & dad." The court continued the section 366.22 hearing to permit DCFS to investigate Emily's statements.

2. *Additional information submitted prior to the contested hearing*

In August of 2012, DCFS filed a progress report from Emily's therapist, Brooke McLean, who had participated in four sessions with Emily and grandmother, three "individual sessions with Emily" and four conjoint sessions with mother and Emily. McLean had also spoken to father about "the family and Emily's presenting problems." McLean reported that neither grandmother nor father "ever mentioned that [father] had been confirmed to have been sexually molesting Emily's older half-sister . . . for approximately twelve years." Although grandmother had "whisper[ed] the allegation at the end of [one] session," she said she "'didn't believe it.'"

McLean reported Emily's "presenting problems included depressive and anxious symptoms including irritability, poor coping skills, and . . . exhibited difficulty

---

**4**     The "Interstate Compact on the Placement of Children" (ICPC) is a compact among California and other states that is intended "'to facilitate the cooperation between states in the placement and monitoring of dependent children.' [Citation.]" (*In re John M.* (2006) 141 Cal.App.4th 1564, 1573 (*John M.*).) Pursuant to the ICPC, no child shall be "sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state [ ] notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." (Fam. Code, § 7901, art. (3), subd. (d).) Although "ICPC compliance is not required for an out-of-state placement with a parent, nothing in the ICPC prevents the use of an ICPC evaluation as a means of gathering information before placing a child with such a parent." (*John M., supra,* 141 Cal.App.4th at p. 1573.)

expressing her emotions." According to McLean, Emily had "clearly stated that she did not wish to return to North Carolina," but had difficulty explaining why. Emily expressed concern her mother would "not be present, emotionally or physically, and worrie[d] that her needs w[ould] not be adequately attended to. . . " Emily stated that although "mother's emotional and physical unavailability" had made her feel like a "lone wolf" and "unimportant," she "no longer feels that way living in California." Emily also said mother was unable to "effectively cope with the stressors of life" and was afraid "mother will try to commit suicide again."

McLean reported that during conjoint sessions with mother, "Emily refuse[d] to discuss the past or future with her mother, as . . . it ma[de] her feel very uncomfortable." McLean observed that mother always "responded appropriately to Emily and asked questions about her current welfare." Mother also "demonstrate[d] concern for [Emily's] well-being and [was] empathic to Emily's feelings." Overall, however, mother and Emily's "conversations revolved [only] around both of their activities over the past week and never touched on the past or the future."

McLean's report summarized three areas of concern she had regarding Emily's situation. First, McLean expressed concern "that DCFS plans on reunifying Emily prematurely with her mother in North Carolina, despite Emily's feeling to the contrary." Mclean explained that although "Emily loves her mother, it causes her significant anxiety to even discuss living in North Carolina. It seems Emily was desperately trying to gain some stability and reliability in her life, and simply the idea of returning to her mother's home may start to shake the very foundation she has begun to piece together in California."

Second, McLean found it "very concerning" that neither father nor grandmother had acknowledged the sustained allegation regarding father's sexual abuse of Jasmine. McLean belived this was "especially concerning because [Emily] is currently living with her paternal grandmother, who seems to choose not to believe the confirmed reports of abuse."

13

Third, McLean was concerned with Emily's inability "to discuss emotionally laden topics" and "her avoidance to dealing with the stress associated with her uncomfortable feelings." McLean concluded this behavior showed Emily lacked "adequate coping skills" that the child would "need to rely on later in life." McLean recommended Emily continue receiving "mental health services to help her process her past experiences[,] . . . more effectively express her thoughts and feelings" and "develop coping skills." McLean also recommended Emily continue to participate in weekly therapy sessions with mother to "help strengthen their relationship and build a sense of trust between mother and child. [Prior to reunification,] [i]t is important that Emily begin to believe that her mother is a reliable caregiver who is able to attend to her needs. . . ."

In September of 2012, DCFS submitted an updated progress report from McLean indicating she had conducted several additional sessions with Emily and mother. McLean reported Emily remained "highly anxious" during the conjoint calls, and, at times, refused to speak to mother. During one call Emily refused to speak because mother had deactivated Emily's cell phone. Mother stated she had turned off the phone because Emily was not responding to her calls. Although Emily claimed she did not hear the phone, mother suggested she was being dishonest and liked to "tell stories."

During another call, mother told McLean Emily did not want to return to her care because "grandmother is available to her 24/7 and lets her do whatever she wants." Mother also stated that "the only reason" she was currently "estranged" from Emily was because they did not live together. After the call, Emily told McLean mother was "'way off' . . . as to the reasons [she] did not want to return to North Carolina." Emily felt mother was "not at all concerned with [Emily's] feelings[] because 'she is so focused on her own feelings'" and expressed "genuine[] concern that her mother will be unable to properly care for her." McLean reported that, in some of the sessions, mother had "expresse[d] negative opinions and feelings about Emily's behaviors and wishes" and "expressed anger toward Emily rather than trying to understand Emily's point of view and feelings . . ."

14

McLean's updated progress report reiterated the three concerns she had discussed in her original report. McLean added, however, that her more recent sessions also raised concerns regarding mother's tendency to "externalize[] all blame and responsibility for [Emily's] estrangement from her." According to McLean, mother failed "to see how her own actions including her own suicide attempt, awareness of the sexual abuse of her older female child, and neglect of Emily's emotional and physical needs, have contributed to Emily's anxious feelings about returning to North Carolina." McLean recommended "six more months for Family Reunification services to allow time for Emily and [mother] to rebuild their relationship in family therapy."

In October of 2012, DCFS filed an information informing the court that North Carolina had still not completed the ICPC on mother. DCFS recommended mother continue to participate in individual and conjoint therapy "until home study is approved." Immediately prior to the contested section 366.22 hearing, however, DCFS filed another information recommending "that family reunification services for mother and father be terminated . . . due to concerns and lack of progress in conjoint counseling between mother and minor Emily." DCFS further recommended that the court schedule a permanency plan hearing pursuant to section 366.26.

### 3. Contested section 366.22 permanency hearing

The contested section 366.22 hearing began in November of 2012 and was not completed until January of 2013. Brooke McLean, DCFS social worker Sandra Paredes, Emily and mother each testified.

### a. Witness testimony

McLean testified DCFS had initially asked her to serve as Emily's individual therapist. As part of the patient intake process, McLean spoke to Emily, grandmother, father and a DCFS social worker. After McLean had conducted several sessions with grandmother and Emily, DCFS asked her to conduct conjoint therapy with mother and Emily. Mclean stated that although she continued to speak individually with Emily

15

before and after the conjoint sessions, she had never spoken to mother alone other than to discuss scheduling.

McLean acknowledged she had never talked to mother about her alleged suicide attempt or her past neglect of Emily. McLean also admitted the statements in her progress reports indicating mother "lacked insight" into how her past conduct had contributed to Emily's anxious feelings were predicated solely on information Emily had provided in private sessions. McLean also testified she could not recall whether grandmother or Emily had first informed her that mother had allegedly tried to commit suicide.

McLean testified that although Emily was currently displaying signs of stress, irritability and anxiety, she believed sending Emily to live with mother in North Carolina "would exacerbate her current symptoms[,] . . . have a poor effect on her ability to cope with these symptoms" and cause "additional harm to her emotional well-being." When asked what would have to change before she would recommend reunification with mother, Mclean stated Emily and mother would have to show "improve[ed] communication skills" and be able to "talk about . . . any past trauma, any issues that she's had, anything that's causing her anxiety in relation to mother." According to McLean, these discussions would "help facilitate and rebuild their relationship and also allow for some corrective experiences between the two of them to begin to build more trust in the relationship." She believed at least six more months of therapy would be required to accomplish these goals, but was uncertain "that would be enough time."

DCFS social worker Sandra Paredes testified that, in April of 2012, it appeared clear to her that Emily would not have objected to living with mother if mother lived in California. Paredes further stated, however, that during the "past couple of months, ther[e had] been a transition" in Emily regarding her willingness to live with mother. Paredes indicated that although Emily had never explained "specifically why" she no longer wanted to live with mother, the child appeared to be "attached" to grandmother and her brother. According to Paredes, Emily became "fidgety" when discussing why she did not want to live with mother and would not "elaborate what it was like living [in

16

North Carolina] with mother [or] what the family dynamic was while living [there]." Emily did, however, express "two instances of mother's behavior that would cause her some concern": mother's past use of alcohol and her suicide attempt. Paredes stated DCFS was unsure whether Emily had actually witnessed these events, or merely heard about them from other people.

Paredes also testified DCFS was concerned "some of the anxiety might be coming from [grandmother]" and that grandmother might be "coach[ing]" Emily. According to Paredes, although grandmother had made great efforts to meet Emily's needs, she frequently "[conveyed] very confusing messages . . to Emily" that had "played a big role" in this case. Paredes explained that grandmother "tend[ed] to advocate in favor of father" and "does not believe that [father's sexual abuse of Jasmine] actually happened." Paredes believed this might "be very confusing for Emily."

Paredes stated that although mother had complied with her case plan, DCFS elected to recommend termination of her reunification services based "mainly" on "Emily's shift . . . in terms of where she'd like to live" and "[McLean's] recommendation." Paredes also stated she believed Emily wanted to stay connected with her mother, would benefit from continued therapy and might be able to reunite with mother at some point in the future.

Emily, who testified in chambers, stated that mother had not provided her with enough food when she lived in North Carolina. When Emily arrived in California, grandmother had told her she looked "skinny[,] . . . scrawny" and malnourished. When Emily was asked why she had trouble speaking to mother about living in North Carolina, Emily stated "[m]y mind shuts down because I get really emotional about it – and I don't like to talk about it." She further explained that she became emotional "[b]ecause I one day witnessed my mom trying to commit suicide." Emily stated the incident occurred when she was five years old while living with mother and her three brothers in North Carolina. Emily said she saw mother retrieve a knife from the kitchen and go into the bathroom, which had a sheet draped over the doorway. According to Emily, mother appeared to hold one arm out and then slide the knife across her wrist. Although the

17

doorway to the bathroom was covered with a sheet, Emily was "pretty sure" mother was "trying to slit her wrist." She then told her brother David, who sent Emily to wait in the living room. Emily later saw Joseph crying and he told her "[m]om tried to commit suicide." The following summer, Emily told grandmother and father about the incident.

Emily testified there was a time when she was "open to going home to . . . mother." When asked why she had changed her mind, Emily stated: ""Because I . . . was older, and I realized more about what happened that day . . . and what suicide was and everything." Emily explained she did not want to return to North Carolina because she "fear[ed] that mother may try to kill herself again." Later in the hearing, Emily stated she also did not want to live in North Carolina because mother would not take her to the dentist or doctor and "would drink a lot. . . . and then she would just kind of shut off, not pay attention to me or anybody else."

Emily also stated part of the reason she became anxious when discussing living with her mother was because she felt "caught in the middle" of her mother and grandmother and "torn apart between . . . two worlds." Emily stated she did not believe things would be "that bad" if she lived with mom, but was "comfortable" in California. Emily also believed mother would "neglect[] [her] at times" and would feel more comfortable if mother would stop "smoking and drinking."

Mother testified over the phone from North Carolina. Mother stated she believed grandmother and father had "coached [Emily] to say the things that she has been saying in order for her to remain out there." Mother said she had noticed a "severe difference" in her relationship with Emily since the child was placed with grandmother. According to mother, Emily had become "distant" and did "not want to talk about anything like she used to talk about before." Mother denied ever having tried to commit suicide and stated she had never been hospitalized for any mental condition. Mother also stated she had never neglected Emily and had always provided the child with food and healthcare.

Mother believed Emily's therapist had been "biased" and based all of her "statements and assumptions" on information obtained from father and grandmother. She stated that McLean had never asked her about the alleged suicide attempt or the "family

18

dynamics" between her and the "paternal relatives." Mother stated she would "never stop fighting" for Emily and expressed frustration that she had been "accused of failing to protect [her child], and yet she is being left with the ones I failed to protect her from."

Mother's counsel attempted to call her son David to testify "in regards to [mother's] alleged suicide attempt." Emily's counsel objected, arguing that the testimony would not be relevant because "the issue is Emily's fear and her emotional turmoil, not the veracity of mother's having attempted suicide." The juvenile court agreed, stating "I don't believe it's . . . David that's at issue. It's how Emily perceives what occurred [¶]. . . [¶] I don't believe David is going to add anything to her perception or her feelings in this case. And everybody had an ample opportunity to cross-examine [Emily] thoroughly with regards to that. . . ."

After the witnesses had testified, mother's counsel requested the court order an expert evaluation of Emily pursuant to Evidence Code section 730.[5] Emily's counsel joined the request, which DCFS did not oppose. The court agreed to appoint Alfred Crespo to conduct an evaluation and continued the section 366.22 hearing.

### b. *Summary of Crespo's section 730 evaluation*

In January of 2013, Crespo submitted his evaluation, which included a summary of his interviews with family members. Crespo reported that although Emily had described mother as "funny and energetic," she did not want to live with mother because mother "drinks and smokes." Emily said mother "spaces out" when she drank and did "not notice many things." Emily also stated she did not believe Jasmine had been abused by father, but later added that she "might" believe the allegations. Emily denied father and grandmother had influenced her views and stated that she wanted the court to "stop

---

[5]     Evidence Code section 730 states, in relevant part:
"When it appears to the court . . . that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report . . . and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

and listen to what I have to say and that is that I want to stay [in California] no matter what . . ."

Emily agreed to meet with mother and tell her why she wanted to stay in California. However, when Crespo brought Emily into a room with mother, Emily "hugged her mother, told her she loved her, and then paused." When Crespo asked Emily if there was anything she wanted to tell her mother, she "again walked up to her mother and hugged her." Crespo asked Emily if she had "changed her mind," and Emily nodded.

Crespo reported grandmother believed mother had told Jasmine to falsify the allegations of sexual abuse against father. Grandmother also stated Emily should "stay put" in California because mother "has always had a drinking problem" and refused to take Emily to the dentist.

Father told Crespo his relationship with mother had ended because of her drinking and smoking. Father stated he was currently homeless and unemployed, but generally stayed with friends who lived near grandmother's house. Father further stated he believed Emily's "best interest is to stay with me and mom," explaining that he visited Emily on a daily basis and made sure she did her school work. Father "vehemently denied" the sexual abuse allegations, stating that mother had fabricated the story "to get me to send the children back against their will." In response to a written question inquiring what father wanted to tell the court, he wrote: "My kids have Never been in any Danger Whatever. The only Reasons We Are here in this Mess is Because the Mother of my kids is sick in the head . . . I believe she has extreme resentment toward me because my kids wanted to live with me instead of with her."

Crespo also interviewed mother, who recounted how Jasmine had informed her of father's sexual abuse. Mother said that grandmother and father had "alienated Emily from her" by telling the child her mother was "doing this for money." Mother further stated she believed the therapy with Emily had been ineffective because "we are not talking face to face" and were living on opposite sides of the country.

In his summary of findings, Crespo stated that father and grandmother "respectively den[y] having confessed or . . . believing Jasmine's allegations [of sexual

20

abuse]. Their general orientation vis-à-vis the sexual allegations . . . appear to mainly be that these were fabricated by the mother in order to retain custody of Emily for financial gain." Crespo also believed Emily had "adopted as her own [grandmother's views] regarding the mother's alcohol abuse and the alleged sexual abuse of Jasmine." Crespo explained "that the efforts made to improve the daughter-mother relationship has [*sic*] been undermined by the influence [of] the grandmother's negative view of the mother." He added, however, that it was unclear whether this was the result of "conscious efforts by grandmother."

Crespo concluded that "given [Emily] has been continuously living with her grandmother . . . for several years, and that her contacts with her mother have been limited to telephonic contact during this period of time, Emily's reluctance to be reunited with her mother, in North Carolina, away from her grandmother, appears to be understandable." Crespo recommended that reunification efforts "should be intensified with the eventual goal being to reunify [Emily] with her mother." Crespo also recommended the court order Emily to take an extended trip to North Carolina and require mother to schedule conjoint counseling sessions for her and the child during the visit. Crespo also thought it was important that Emily be informed the court had found the sexual abuse allegations against father to be true, which was "obviously in conflict with what Emily has been lead to believe [by grandmother and father]."

### c. *Closing arguments and decision*

After receiving Crespo's section 730 evaluation report, the court heard closing arguments. Mother's counsel argued that Emily's preference as to where she wanted to live were not controlling. Counsel also asserted the mere fact Emily had bonded with grandmother was not a sufficient basis to deny reunion with mother. Counsel contended that leaving Emily in the care of grandmother presented a greater risk to the child's well-being because: (1) grandmother did not believe the sexual abuse allegations that had been sustained by the court; and (2) father visited Emily at grandmother's house almost every day.

21

Mother's counsel argued that if the court was not willing to return Emily to mother, it should continue the section 366.22 hearing pursuant to section 352 and "follow Crespo's recommendation . . . [to] continue reunification services for the mother so that minor and mother can continue conjoint therapy and to also allow minor to have an extended visit with mother in North Carolina during spring break." Counsel explained that continuing the hearing would "not be detrimental to the minor as the continuance would maintain the status quo and provide Emily an opportunity to transition from Grandma's home back to mothers . . ."

Emily's counsel argued the child's statements about where she wanted to live were "more than just a preference" and appeared to be "rooted in fears and anxieties" about living with mother. Counsel argued that "[w]hether or not grandmother or father have poisoned the well . . . and have influenced Emily is not relevant . . .Whether Emily's fears and anxieties are based on true factual situations or come from some irrational place, her fears are still real they're still present . . . and continue to suggest that Emily is in need of therapy and return would be detrimental."

DCFS argued McLean's testimony demonstrated that forcing Emily to return to her mother at this time would place the child at substantial risk of emotional harm. Although DCFS asserted the Welfare and Institutions Code prohibited the court from extending mother's reunification services any further, it recommended the court bypass the section 366.26 hearing and "order Emily into a long-term foster care." DCFS explained that, "[b]y doing so, the court can continue services to Emily, if the court believes that counseling is necessary[,] as the department strongly believes . . . , the court can order it for the benefit of Emily. It's quite clear that everyone's goal in this case is to . . . if possible return Emily to the care of her mother. But that is a proposition which . . . is going to take a significant period of time."

The court adopted DCFS's recommendation and ordered Emily to be placed in long-term foster care, with grandmother as caretaker. The court explained that, based on Emily and McLean's testimony, it was "very apparent . . . there is detriment to return at this time." The court explained that Emily had "expressed feelings of emotional

22

distraught" about being returned to mother  and that both McLean and Crespo believed "more therapy [wa]s needed as to Emily before return can occur. . ."  The court added: "Despite the possible influence by the grandparent, Emily has articulated her feelings, emotional feelings, with regards to her return, and I think that is what it is.  And the facts indicate that very clearly from both her testimony and the therapist's testimony in this case.  So the court is finding that termination of reunification services is in the best interests of the child at this time . . ."

The court further ordered, however, that based on the "totality" of the evidence, it was in the "best interests of the child to set this for a planned permanent living arrangement for Emily and to have continuing services in this case to see if at one point, possibly, that we can possible reunify her with the mother having given the opportunity to Emily to have further services in order to be able to cope with some of her emotional issues . . ."

The court ordered Emily to participate in "[c]onjoint counseling" with mother and further ordered DCFS to consider "gradual visits [with mother] to see if we could facilitate that at the appropriate time."  The court then inquired whether any of the parties opposed the court's decision to select long-term foster care as the permanent plan, rather than scheduling  a section 366.26 hearing.  All parties submitted on the issue. The court set the matter for a progress hearing and also scheduled a six-month review of Emily's permanent plan pursuant to section 366.3.  Mother filed a timely appeal of the court's order.[6]

---

[6]    Although orders that are contemporaneous to an order setting a section 366.26 hearing (including contemporaneous orders terminating reunification services) are not appealable other than by extraordinary writ (*In re Ricky H*. (1992) 10 Cal.App.4th 552 561-562; § 366.26, subd. (l)), "orders . . . that bypass the section 366.26 hearing and select long-term foster care as the minor's permanent plan . . . are final and appealable under section 395 as orders subsequent to a judgment of dependency because nothing further is required to establish the permanent plan."  (*In re Dustin R*. (1994) 54 Cal.App.4th 1131, 1138 (*Dustin R*.).)

**DISCUSSION**

Mother raises three arguments on appeal. First, she contends there was insufficient evidence to support the juvenile court's finding that returning Emily to her care would create a substantial risk of detriment to the child's emotional well-being. Second, she asserts the juvenile court erred in refusing to allow her son David to testify at the section 366.22 hearing. Third she argues the court abused its discretion when it denied her oral request for a continuance of the section 366.22 hearing to permit further reunification services.

### A. *Substantial Evidence Supports the Court's Finding that Emily's Return to Mother Would Create a Substantial Risk of Emotional Detriment*

We review the court's finding that returning Emily to mother's care would create a risk of detriment to the child's emotional well-being for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) "'In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible.' [Citation.]" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

Under section 366.22, subdivision (a), the juvenile court is required to return the child to the custody of the parent at the 18-month permanency hearing unless it determines, by a preponderance of the evidence, that return of the child would "create a substantial risk of detriment to the child's physical or emotional well-being." "[T]he decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899 (*Joseph B.*).) "The risk of detriment must be substantial, such that returning a child to parental custody represents some danger to the child's

physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).)

In assessing whether returning the child to his or her parent would create a risk of detriment, the juvenile court may consider, among other things: "compliance with the reunification plan" (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 (*Constance K.*)); the child's expressions and feelings about returning to the parent (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 974 (*Alvin R.*)); "properly supported psychological evaluations which indicate return to a parent would be detrimental to a minor [citations]" (*Constance K., supra*, 61 Cal.App.4th at p. 705); "the opinion of the [investigating] social worker" (*Alvin R., supra,* 108 Cal.App.4th at p. 947; § 366.22, subd. (a) [the court "shall review and consider the social worker's report and recommendations"]; and "limited awareness by a parent of the emotional and physical needs of a child." (*Constance K., supra*, 61 Cal.App.4th at p. 705.)

In this case, several categories of evidence support the juvenile court's risk of detriment finding. First, Emily repeatedly told DCFS, McLean, Crespo and the juvenile court she did not want to return to mother's custody. McLean's progress reports indicated Emily had stated she was worried mother would "not be present, emotionally or physically" and would not be able to meet her needs. Emily made similar statements to DCFS and Crespo, emphasizing that she wanted the court to "'stop and listen to what I have to say and that is that I want to stay [in California]." Emily also submitted a handwritten letter to the court explaining that she wanted to stay in California and did not want to be returned to her mother. She provided similar testimony at the section 366.22 hearing, repeatedly stating she did not want to return to her mother's care. After observing Emily's testimony, the juvenile court concluded she had clearly expressed "feelings of emotional distraught" at the prospect of being returned to mother. We must accept "the juvenile court's assessment of [the child's] demeanor . . . and the reasonable inferences it has drawn as a result." (*Alvin R., supra*, 108 Cal.App.4th at p. 974 [affirming finding of emotional detriment based, in part, on court's description of child's "demeanor" at contested hearing].)

The court's finding was also supported by the reports and testimony of therapist McLean and social worker Paredes. Both of McLean's progress reports warned that "reunifying Emily prematurely with her mother in North Carolina" would "shake the very foundation she has begun to piece together in California." McLean's reports also stated Emily currently lacked "adequate coping skills" to handle the stress and anxiety associated with a return to her mother. At the section 366.22 hearing, McLean testified that returning Emily to mother without additional therapy would "exacerbate her current" anxiety and cause "harm to her emotional well-being." DCFS social worker Paredes similarly recommended that, based on Emily's expressed desire to stay in California and the conclusions set forth in McLean's reports, the court should leave Emily in her current placement with grandmother.

DCFS also presented evidence suggesting mother had demonstrated limited awareness regarding the emotional needs of Emily. In McLean's second progress report, she expressed concern that mother "externalize[d] all blame and responsibility for [Emily's] estrangement from her" and failed to consider whether her own actions had contributed to the situation. McLean also noted that mother had "expressed anger toward Emily rather than trying to understand Emily's point of view and feelings . . . ."

Considered collectively, the testimony of Emily, McLean and Paredes, and the information in the reports of McLean and DCFS, provide substantial evidence supporting the juvenile court's finding that returning Emily to mother at this time would create a substantial risk of detriment to the child's emotional well-being.

Mother disagrees, arguing there are three reasons we should reverse the juvenile court's finding. First, she contends the record shows she has successfully participated in her case plan and "addressed the presenting problems in the case, i.e., her failure to protect Emily from the risk Father posed based on his past sexual abuse of Jasmine." However, "[t]he question whether to return a dependent child to parental custody is not governed solely by whether the parent has corrected the problem that required court intervention; rather the court must consider the effect such return would have on the child." (*Joseph B., supra*, 42 Cal.App.4th at p. 894; see also *Jennifer A. v. Superior*

26

*Court* (2004) 117 Cal.App.4th 1322, 1344 (*Jennifer A*).)  As explained by one court, "[c]ompliance with the reunification plan is certainly a pertinent consideration at the section 366.22 hearing; however, it is not the sole concern before the dependency court judge."  (C*onstance K., supra*, 61 Cal.App.4th at p. 704.)  Where, as here, the record contains substantial evidence supporting a juvenile court's risk of detriment finding, we cannot reverse the finding based solely on a parent's compliance with his or her case plan.[7]

Second, mother contends that although the record contains evidence suggesting Emily might suffer "some type of detriment" if returned to her care, there is no evidence demonstrating Emily would suffer the sort of "serious emotional harm" that is necessary to support continued placement.  In support, mother notes that neither McLean nor Crespo identified any specific form of "serious mental health problem" or "significant psychopathology" that might occur if Emily were returned to mother.  Mother, however, has not identified any case law suggesting that a juvenile court's finding of risk of emotional detriment must be supported by evidence showing the child may develop serious mental health problems or a "significant psychopathology."  Mother's argument also finds no support in the text of section 366.22, which states the court may order

---

[7]    Several cases have recognized that if the juvenile court finds a risk of detriment based on problems or facts that arose during the reunification period, and that have no relation to the original basis for dependency, the parent may properly request additional reunification services addressing those issues:  "We . . . have rules in place to address the situation where the juvenile court finds it detrimental to return the minors to the home despite the parents' achieving the [reunification] plan' s objectives.  In [that case] . . . the reunification plan would probably not be reasonable and the parents could mount a challenge on that basis."  (See *Dustin R., supra*, 54 Cal.App.4th at p. 1143; *Jennifer A., supra,* 117 Cal.App.4th at pp. 1344-1345 ["[A] . . . problem detected after initial detention might be a reason for denying return of a dependent child to the parents' custody.  The question in that situation would be whether reasonable reunification services relating to the . . . [problem detected after the initial detention] have been offered"].)  Here, however, mother did not argue the reunification services DCFS provided were unreasonable or inadequate to address the reasons for Emily's continued placement.  Instead, she argued only that DCFS failed to show returning Emily to her care would create a substantial risk of detriment to the child's emotional well-being.

continued placement of the child if the evidence shows return to the parent will create "substantial risk of detriment" to the child's "emotional well-being." This language gives the juvenile court "broad discretion to evaluate the . . . the child's . . . emotional well-being. . . . [A]ll that is required is a finding [that placement with the parent] would impair the emotional security of a child." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1490.)

Mother's contention the evidence only showed Emily was at risk of minor distress, rather than significant emotional harm, is essentially a challenge to the manner in which the juvenile court interpreted the evidence and the inferences it drew from that evidence. However, under the substantial evidence standard of review, we are not permitted to "re-weigh the evidence or determine the credibility of the witnesses." (*In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1255.) "'All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the decision, if possible.' [Citation.]" (*In re N.M.* (2009) 174 Cal.App.4th 328, 335.)

Finally, mother contends that three prior decisions–*Yvonne W., supra,* 165 Cal.App.4th 1394, *In re E.D.* (2013) 217 Cal.App.4th 960 (*E.D.)* and *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 (*David B*.)–"illustrate the defect in the court's ruling." Although each of these decisions reversed a risk of detriment finding, they are all factually distinguishable from the present matter.

In *Yvonne W.* the court ruled that a child's "fear, anxiety and unhappiness about living in the shelter" where her mother resided was, standing alone, insufficient to support a finding of risk of emotional detriment. (*Yvonne W., supra,* 165 Cal.App.4th at p. 1401.) The court explained that "[a] child's dislike of a parent's living arrangement, without more, does not constitute a substantial risk of detriment within the meaning of section 366.22, subdivision (a)." (*Ibid.*) In reaching its ruling, the court emphasized DCFS had presented no evidence the "conditions at the shelter pose[d] a risk of harm" to the child. (*Id.* at p. 1402.) In this case, the court's ruling was not based on Emily's objections to living in the state of North Carolina or in the particular residence where mother lived. Rather, it was based on (among other things) the feelings and emotions

28

Emily displayed at the section 366.22 hearing and McLean's opinion that returning Emily to mother would create a risk to her emotional well-being.

In *E.D.*, *supra,* 217 Cal.App.4th 960, the court reversed the juvenile court's risk of detriment finding because it had "failed to cite *any* evidence that returning the minor to father's custody would create a 'substantial risk of detriment' to the minor." (*Id*. at p. 966 [emphasis in the original].) The court noted the record showed the child had "consistently said he wanted to live with father" (*id*. at p. 964) and that DCFS "supported the minor's return to the parent." (*Id*. at p. 966.) In contrast, the juvenile court in this case articulated exactly which evidence it had relied on in making its findings. Moreover, unlike in *E.D.*, Emily repeatedly stated she did not want to be placed with mother and DCFS did not support the child's return to mother.

In *David B., supra,*123 Cal.App.4th 768, the court reversed a risk of detriment finding that was based entirely on the opinions and recommendations of the child services agency. The court ruled it was "compelled to reverse the order" because the record "clearly relflect[ed]" that the juvenile court had "deferred to [the social services] 'discretion'" when assessing the risk of harm to the child. (*Id*. at p. 796.) The court explained that, under section 366.22, subdivision (a), the juvenile court could "not presume that the [agency's] judgments about the propriety of returning children to their parents' custody [we]re correct"; rather, the court had a duty to "independently" evaluate that judgment "in accordance with the proper standards of proof." (*Id*. at p. 797.) In this case, there is no suggestion in the record that the juvenile court simply deferred to DCFS's placement recommendation. Indeed, when explaining the basis for its ruling, the court did not even refer to DCFS's evaluation. Instead, it focused on information and testimony that had been supplied by Emily and McLean.

### B. The Juvenile Court Did Not Abuse its Discretion By Excluding the Testimony of Mother's Adult Son David

Mother argues the juvenile court committed evidentiary error when it refused to permit her adult son David to provide testimony related to her alleged suicide attempt.

Mother attempted to call David to testify after Emily provided statements indicating one of the reasons she did not want to live with mother was because of concerns about mother's previous suicide attempt. Emily recounted that, when she was five years old, she was "pretty sure" she had witnessed mother try to cut her wrists with a knife. Mother argued David, who was present during the incident Emily had described, would provide testimony clarifying mother had not actually attempted to commit suicide. The juvenile court excluded the evidence pursuant to Evidence Code section 352, explaining that whether mother had actually attempted suicide and David's observations of the event had little relevance to Emily's "perceptions and feelings" about returning to mother. The court further noted that "everybody had an ample opportunity to cross-examine [Emily] thoroughly" about the alleged suicide attempt and her perceptions of the event.

Evidence Code section 352 states, in relevant part: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Section 352 provides the trial court "'broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]"' [Citation.]" (*People v. Williams* (2013) 58 Cal.4th 197, 270-271 (*Williams*).)

Mother does not dispute that whether she actually tried to commit suicide was of minimal probative value in assessing the impact that returning Emily to mother's care would have on the child's emotional well-being. Mother argues, however, that the court should have still permitted David's testimony because "the nature of Emily's feelings and perception about mother could not be properly measured . . . without affording mother a meaningful opportunity to test Emily's credibility about the underlying family history." Mother appears to assert David's testimony would have cast doubt on Emily's overall

30

credibility, thereby raising questions as to whether Emily was truthfully representing how she felt about being returned to mother's custody.

Mother overlooks that the court did in fact permit mother to "test Emily's credibility" about the alleged suicide attempt. At the section 366.22 hearing, all of the parties were allowed to question Emily about what she believed she had witnessed on the day in question. Moreover, mother was permitted to provide her own testimony as to what occurred that day. Mother denied that she had ever attempted suicide and further denied ever having been hospitalized for any mental condition.

It is also apparent that David's proposed testimony would have provided minimal probative value in assessing whether Emily was being truthful in her testimony as to what she believed she saw her mother do. Emily testified that when she was five years old (which was seven years before the hearing), she saw mother carry a knife into the bathroom and was "pretty sure" mother had tried to cut her wrists. Although David's testimony might have cast doubt on whether Emily correctly perceived the nature of mother's conduct, it would have provided little insight into whether Emily actually believed she had seen mother try to commit suicide. Mother has never alleged David has any particular knowledge as to what Emily believes she saw.

Finally, even if we assume David's testimony might have established Emily fabricated the story about mother's attempted suicide, mother has failed to explain why that would undermine Emily's testimony regarding her feelings about being returned to mother's care. Indeed, evidence proving Emily was willing to fabricate testimony to avoid placement with mother would only seem to highlight her desire not to be returned to mother's care. We find no abuse of discretion in the court's conclusion that testimony tending to show Emily either misperceived the nature of mother's conduct or fabricated her testimony about the event in question was of minimal probative value in determining what effect returning her to mother's custody would have on her current emotional well-being.

Mother also argues David's testimony would have been probative of whether Emily "actually witnessed the event, or whether she had merely been told to believe these

things by Grandmother." Mother appears to contend David's testimony that mother did not attempt suicide would have bolstered her claim that all of Emily's testimony was the result of grandmother's improper influence. The juvenile court did not act arbitrarily in concluding David's testimony regarding the alleged suicide attempt would provide minimal probative value on the question of grandmother's influence over Emily. Social worker Paredes, McLean and Emily all provided testimony directly addressing whether grandmother had influenced Emily's statements and testimony. In contrast, David's proposed testimony was minimally relevant to that issue. At most, David's testimony might have supported an inference that because mother did not actually attempt to commit suicide, Emily's belief that she had witnessed such an event was a product of grandmother's influence. Given the substantial amount of testimony the court heard on the issue of grandmother's influence, and the minimal probative value David's testimony would have added, there is no basis to conclude the trial court abused its discretion in excluding it.

Even if we were to find the juvenile court abused its discretion in excluding David's testimony, the record shows the error would have been harmless. To obtain reversal of the juvenile court's dependency order based on the evidentiary error alleged here, mother would have to demonstrate a reasonable probability that she would have obtained a more favorable result in the absence of the error. (See *In re A.M.* (2008) 164 Cal.App.4th 914, 928 [*Watson* harmless error test applies in juvenile dependency matters where error does not implicate federal Constitutional right]; *People v. Marks* (2003) 31 Cal.4th 197, 226-227 ["[T]he application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson . . .* "].)

Mother has not shown there is any probability the juvenile court would have returned Emily to her care if David had been permitted to testify that mother did not actually attempt to commit suicide. In reaching its ruling, the court did not place any reliance on Emily's testimony that she believed she had seen mother attempt to commit suicide when she was five years old. The court relied primarily on the feelings and

32

emotions Emily expressed when discussing whether she wanted to be returned to mother. The court also relied on McLean's opinions as to what effect returning Emily to mother would have on the child's emotional well-being. McLean's opinions, in turn, were predicated almost entirely on her observations of Emily's demeanor when the child was forced to discuss whether she wanted to live with mother.[8]

### C. *The Juvenile Court Did Not Abuse its Discretion in Denying Mother's Motion to Continue the Section 366.22 Hearing*

Mother argues the juvenile court abused its discretion when it denied her motion to continue the section 366.22 permanency hearing pursuant to Welfare and Institutions Code section 352. Mother contends the court was required to delay the hearing and offer her additional reunification services because Crespo and McLean both indicated Emily might be able to reunify with mother after undergoing additional therapy. We review the juvenile court's denial of mother's motion for a continuance under the abuse of discretion standard. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 585 ["The court's denial of a request for a continuance will not be overturned on appeal absent an abuse of discretion."].)

#### 1. *Summary of applicable law*

Under the statutory framework set forth in the Welfare and Institutions Code, "[f]amily preservation . . . is the first priority when child dependency proceedings are commenced." (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1798 (*Elizabeth R.*).) To achieve the goal of preserving the family, a parent is generally "entitled to 12 months of reunification services when the child is at least three years of age on the date of removal from parental custody. [citations]." (*In re Mark L.* (2001) 94 Cal.App.4th 573, 584-585; see also §§ 361.5, subd. (a)(1)(A); 366.21, subd. (f).) If the parent has not successfully

---

[8] Our finding that the court did not err in excluding David's testimony pursuant to Evidence Code section 352 forecloses mother's contention that the exclusion violated her due process rights. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 809 ["The routine and proper application of state evidentiary law does not impinge on a defendant's due process rights"].)

reunified with his or her child by the 12-month permanency hearing, the court may extend services for an additional six month period "if it finds . . . there is a substantial probability . . . the child will be returned to the physical custody of his or her parent . . . within the extended period of time . . ." (§ 366.21, subd. (g).)

However, at "the 18-month review stage . . . ., further services are ordinarily not an option which the court may consider. [Citations]." (*Carolyn R. v. Superior Court* (1995) 41 Cal.App.4th 159, 167.) "The statutory language is clear and mandatory. If the minor is not returned to the parent [at the section 366.22 18-month permanency hearing], 'the court *shall* order . . . termination of reunification services.' [Citation.]" (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1017, fn. 10 [citing and quoting § 366.22, subd. (a), italics added]; see also § 361.5, subd. (a)(3) ["court-ordered services may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody"].) This statutorily-imposed "cutoff date" reflects the Legislature's determination that, after 18 months of unsuccessful reunification services, the "child's need for stability and security . . . becomes paramount." (*Elizabeth R., supra,* 35 Cal.App.4th at p. 1787; *Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1388 (*Andrea L.*) [By placing an 18-month limit on reunification services, "[t]he Legislature has recognized there must be a limitation on the length of time a child has to wait for a parent to become adequate in order to prevent children from spending their lives in the uncertainty of foster care"].)

Welfare and Institutions Code "[s]ection 352 provides an emergency escape valve" (*Elizabeth R., supra,* 35 Cal.App.4th at p. 1798) that permits the juvenile court "to extend family reunification services beyond the statutory limit in a special needs case." (*Andrea L., supra,* 64 Cal.App.4th at p. 1388.) Section 352 states, in relevant, part: "Upon request of counsel . . . the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor. . . . [¶] Continuances shall be granted only upon a showing of good cause and only for that

period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance. . . ."

Courts have utilized section 352 to extend reunification services beyond the 18-month stage in "extraordinary" cases where "the services offered [were] . . . defective in some way" (*Renee J. v. Superior Court* (2000) 96 Cal.App.4th 1450, 1465) or where an "external factor . . . prevented the parent from participating in the case plan." (*Andrea L., supra*, 64 Cal.App.4th at p. 1389.) Generally, where "extraordinary special needs are not at issue, . . . the juvenile court's extension of services beyond 18-months [is] an abuse of discretion and in excess of its jurisdiction, as limited by statute." (*Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1511 [citing *Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1091-1092].)

### 2. *The court did not abuse its discretion in denying mother's section 352 motion*

In this case, mother does not claim she was entitled to a continuance because an "external factor" interfered with her ability to participate in her case plan. (*Andrea L., supra*, 64 Cal.App.4th at p. 1389.) Nor does she contend her services were "defective in some way." (*Renee J., supra*, 96 Cal.App.4th at p. 1465.) Instead, she argues the court was required to grant a continuance because the evidence showed there was a probability Emily would be able to reunify with mother if they engaged in more therapy.

Mother fails to consider that although the court denied her motion for a continuance, it nonetheless structured its orders in a manner that preserved the possibility of reunification in the future. After terminating reunification services, the court obtained the parties' consent to bypass the section 366.26 hearing and select long-term foster care as Emily's permanent plan.[9] The court also ordered Emily to continue participating in

---

[9] Section 366.22 permits the juvenile court to bypass the setting of a section 366.26 hearing and order a child to remain in long-term foster care if it finds "by clear and convincing evidence, based on the evidence already presented to it, . . . that there is a compelling reason . . . for determining that a hearing held under Section 366.26 is not in the best interests of the child because the child is not a proper subject for adoption and

conjoint counseling with her mother and set the matter for a six-month permanent plan review pursuant to section 366.3.  The court explained that its orders were intended to allow Emily "to have continuing services . . . to see if at one point . . . we can possibly reunify her with the mother."**10**

Under section 366.3, when a child has been placed in long-term foster care and parental rights have not been terminated, the parent is entitled to participate in a status review hearing regarding the child's permanent placement plan every six months. (§§ 366.3, subds. (d) & (f).)  At each six-month hearing, the court may reinstitute reunification services if the parent proves "by a preponderance of the evidence, that further efforts at reunification are the best alternative for the child."  (§§ 366.3, subds. (f) & (d)(4).)  The court is also required to consider, among other things: "all permanency planning options for the child including whether the child should be returned to the home of the parent" (§ 366.3, subd. (h)); "[t]he extent of progress the parents . . . have made toward alleviating or mitigating the causes necessitating placement in foster care" (§ 366.3, subd. (d)(7)); and "[t]he likely date by which the child may be returned to, and safely maintained in, the home [or other permanent placement]."  (§ 366.3, subd. (d)(8).)

As the court explained at the section 366.22 hearing, because Emily has been placed in long-term foster care and mother's parental rights have not been terminated, mother will have an opportunity to reunify with Emily if the continuing conjoint therapy proves successful.  Alternatively, mother may be able to obtain a reinstatement of her

has no one willing to accept legal guardianship."  In this case, DCFS, mother, father and Emily all agreed with the court's proposal to select long-term foster in lieu of setting a section 366.26 hearing.  Because no party has raised any issue regarding that portion of the court's decision, we assume the court's actions were proper.

**10**     The court entered various additional orders that addressed concerns mother had raised about the fairness of the dependency proceedings.  First, the court ordered DCFS to investigate whether McLean had a conflict of interest in serving as both mother and Emily's conjoint therapist and Emily's individual therapist.  Second, the court ordered grandmother not to discuss the issue of placement with Emily.  Third, the court ordered DCFS to investigate whether a second monitor should be assigned to aid grandmother in monitoring father's visits with Emily.

reunification services. Thus, mother has effectively received the very relief she requested in her motion for a continuance: an opportunity to participate in additional services with Emily that may ultimately result in reunification.[11] We find no basis for concluding the juvenile court abused its discretion by using mechanisms other than a section 352 continuance to provide mother an opportunity to reunify with her child.[12]

---

[11]   The minute orders issued since the section 366.22 hearing indicate that: (1) the juvenile has maintained long-term foster care as Emily's permanent placement plan; (2) the court has still not set a section 366.26 permanency planning hearing; and (3) the court has continued to require Emily to participate in services with mother, including conjoint therapy and visits to North Carolina. The most recent minute order also indicates the court has ordered DCFS to initiate an ICPC investigation on mother's home in North Carolina. These orders suggests that, despite the termination of mother's reunification services, the court has ordered Emily to continue participating in services and is now investigating whether mother's home in North Carolina is a suitable residence for Emily.

[12]   If the juvenile court elects to set a section 366.26 permanency plan hearing at some point in the future, mother will have an opportunity to challenge that decision through a petition for writ review. (See § 366.26, subd. (l).) Given the current state of the record, it appears unlikely mother's parental rights could be properly terminated in the absence of some additional, newly discovered evidence. At the jurisdictional phase of these proceedings, DCFS recommended the court deny the section 300 petition with respect to mother given that North Carolina child services specifically told her she could send Emily to with the father and the paternal grandmother in California. The court, however, elected to sustain the petition. Since then, mother has diligently complied with every aspect of her case plan and made frequent cross-country trips to participate in the dependency proceedings. The evidence also indicates that: mother has continued to engage in conjoint therapy with Emily; mother is gainfully employed at a hospital and lives in a comfortable residence where Emily would have her own bedroom; mother does not have any drug or substance abuse problem; and mother's therapist in North Carolina has repeatedly informed the court Emily can be safely returned to her mother. There is also no evidence suggesting mother mistreated Emily while the child was living with her in North Carolina. Rather, the petition was based solely on the fact she permitted Emily to visit her father in California.

## DISPOSITION

The juvenile court's order is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.